# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 13, 2014

## STATE OF TENNESSEE v. EMMANUEL BIBB HOUSTON

**Appeal from the Circuit Court for Bedford County**
**No. 17467    Robert G. Crigler, Judge**

**No. M2013-01177-CCA-R3-CD   Filed 06/04/2014**

Appellant, Emmanuel Bibb Houston, stands convicted of especially aggravated kidnapping, aggravated burglary, and facilitation of especially aggravated robbery. The trial court imposed a total effective sentence of twenty-three years. On appeal, appellant argues that the evidence was insufficient to support his conviction for especially aggravated kidnapping and that his sentence was excessive. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Christopher P. Westmoreland, Shelbyville, Tennessee, for the appellant, Emmanuel Bibb Houston.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Robert James Carter, District Attorney General; and Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case concerns the beating and robbery of the victim, Gregory Marlin, which occurred between May 6 and May 7, 2012,[1] and the burglary of his house. A Bedford County grand jury indicted appellant for especially aggravated burglary, especially aggravated robbery, and especially aggravated kidnapping for his part in the offenses. Other individuals were charged separately for their involvement.

At appellant's trial, the victim testified about the length of time he had known each person involved in the May 6-7, 2012 incident. He had known appellant and Deonta Twilley for two years and had known Samantha Houston and Ericka Myrick for a "couple of weeks." He met Latorria McCord and Alicia Briane Jones on the day of the incident. On May 6, 2012, Ms. Houston, Ms. Myrick, Ms. McCord, and Ms. Jones were at his house, and they were "just drinking, hanging out." The victim's cousin, Alton Smith, was also at the apartment, and appellant had been there for a time. That evening, the victim and Mr. Smith went to Nashville, and the women left his house.

The victim returned home between 11:00 p.m. and 11:30 p.m. He invited the women to return to his house, and Ms. Myrick, Ms. McCord, and Ms. Jones did so. The women had not been at his house for more than thirty minutes before someone knocked on his door. When he answered the door, he saw appellant, Mr. Twilley, and Ms. Houston. The victim testified that appellant had a baseball bat but that he did not see the bat until appellant had already entered the house. The victim further testified that appellant began accusing the victim of talking about him and "saying s*** about [him]." The victim told him that he did not know what appellant was talking about.

The victim said that he and appellant exchanged words for a few seconds. Then, appellant hit the victim with the bat twice on his side and once on the top of his head. The blow to his head caused him to bleed. The victim testified that he "fell to the ground" and that appellant pressed the bat to his neck. While he was pinned down by appellant, the victim noticed Ms. Houston carrying a small flat-screen television that he kept in his bedroom. He learned later that his cellular telephone and $800 were also taken from his house. The victim stated that Mr. Twilley held a gun to the back of his neck. He recalled that appellant told Mr. Twilley, "Go on and kill him." Regarding the other people who had been in his house, the

---

[1] When questioning the witnesses, the assistant district attorney general used the date "May 7" but later stated that the offense occurred in the late hours of May 6 and early hours of May 7. The offense date listed on the indictment is May 7, 2012.

victim said that he remembered seeing Ms. Myrick "standing over" him, watching what was happening. He did not see Ms. Jones and Ms. McCord.

The victim further said that appellant "hogtied" him with cords cut from the victim's two vacuum cleaners and with the victim's belt. The victim did not know who had given appellant the cords. According to the victim, appellant tied him up in the kitchen, and then, appellant and Mr. Twilley carried him to the bathroom and threw him in. They shut the door and left the house. The victim said that he heard his back door close, so he believed that he was alone. He stated that he was able to free himself from the cords after thirty minutes and that in order to free himself, he had to remove his shoes and break his belt. The victim said that he went to his neighbor's house to call the police. When the police arrived, he told them appellant's name and described his vehicle. The victim testified that he was in pain and having difficulty breathing while he was talking to the police. An ambulance arrived and transported him to a hospital.

The victim testified that he stayed in the hospital for six days, after which time he left against his doctor's orders. He said that the wound on his head required ten stitches and that at the time of trial, he had a visible scar from that wound. The victim testified that he also had five broken ribs and a collapsed lung. He said that the pain from the incident lasted two and a half to three months. The victim said that he did not give appellant permission to enter his house and attack him nor did he give anyone permission to take his property. The victim testified that he was afraid during the incident and believed that the men were going to kill him.

On cross-examination, the victim clarified the timeline of events. He said that appellant hit him with the bat in his living room. He fell down, and he tried to get up and run. He made it to his kitchen, where appellant jumped on him and held him down with the bat pressed to his neck. The victim denied having made "any derogatory statements about" appellant or "threatening statements" about appellant and Ms. Houston. He also denied telling the police that marijuana had been stolen from his house.

Shelbyville Police Sergeant Charles Merlo testified that he responded to the victim's house on May 7, 2012. When he first saw the victim, he noticed that the victim had a "large severe laceration on the top of his head." In addition, the victim "was having trouble breathing" and appeared to be in pain. In the living room of the victim's house, the cushions from the furniture were on the floor, and a chair had been overturned. Sergeant Merlo testified that there were small amounts of blood in the living room and the kitchen. There "was quite a bit of blood" in the bathroom. Sergeant Merlo described the living area of the victim's house as "one big open room" with no division between the living room and the kitchen. He found an electrical cord in the living area that appeared to have been cut from

a vacuum cleaner found in the back bedroom. He also found a piece of a belt inside the home and another piece outside. There was a cable cord attached to the wall in the victim's bedroom, but no television was attached. Sergeant Merlo testified that the victim told him that appellant and Deonta Twilley were responsible for the attack and that appellant drove a white Yukon Denali. Bedford County and surrounding counties were notified to "be on the lookout for" the Denali, and appellant was stopped by law enforcement in Murfreesboro. When he was stopped, Mr. Twilley, Ms. Houston, Ms. Myrick, Ms. McCord, and Ms. Jones were also in the vehicle. Sergeant Merlo transported appellant and Mr. Twilley back to Shelbyville.

Ericka Myrick testified that when the victim and his cousin left for Nashville, she and the rest of the group who had been at the victim's house went to appellant's house. While they were there, someone told appellant that the victim had tried to take money that appellant had left on a counter at the victim's house. Someone also told appellant that the victim had told Ms. Myrick that she should not "be messing with" appellant and that the victim called appellant an "old a** n****r." Ms. Myrick testified that appellant "was mad" and wanted to retaliate against the victim. He told her that he "was going to scare the s*** out of" the victim and take anything the victim had in his pockets.

Ms. Myrick further testified that she, Ms. McCord, and Ms. Jones returned to the victim's house after he came back from Nashville. Within thirty to forty minutes of the women's arrival, appellant, Ms. Houston, and Mr. Twilley arrived at the victim's house. They knocked on the door, and the victim answered. Ms. Myrick said that the victim tried to shake appellant's hand but that appellant "pushed him back and said, [']I'm tired of you talking s***.[']" Ms. Myrick testified that the men scuffled and that appellant "pulled the bat . . . from his waist" and began hitting the victim with it. Then, appellant held the victim down using the bat. Ms. Myrick stated that Ms. Houston gave a gun to Ms. McCord, who held the gun to the victim's head and "told him [that] if he moved[,] she was going to blow his brains out." While this was happening, Ms. Houston was searching the victim's house. At some point, Ms. McCord and Ms. Jones left, and Ms. McCord took the gun with her. Ms. Myrick said that a man named Antwan Dyer drove Ms. McCord and Ms. Jones to appellant's house. After they left, appellant asked where his gun was because he was going to kill the victim. Ms. Myrick testified that she tried to get appellant to leave but that he would not listen to her. She recalled seeing Ms. Houston enter the back bedroom with a kitchen knife and return with a vacuum cleaner cord. Ms. Houston and appellant used the cord to tie the victim's hands and feet behind him. Ms. Myrick testified that Mr. Twilley stood over the victim, holding the bat, while Ms. Houston and appellant were tying him up and that Mr. Twilley told the victim not to move. Ms. Myrick went outside at some point, and when she returned, the victim had been put in the bathroom.

Ms. Myrick testified that after the victim had been placed in the bathroom, all of them (Mr. Twilley, Ms. Houston, Ms. Myrick, and appellant) left the victim's house. Appellant drove them to his house. Ms. Myrick recalled seeing him cleaning the bat while they were at his house. Ms. McCord, Ms. Jones, and Mr. Dyer were also at appellant's house, and Mr. Dyer returned to appellant the gun that Ms. McCord had taken. According to Ms. Myrick, all of the people involved decided to go to Ms. Houston's house in Nashville, but they had to pack clothes first. They met at Ms. Myrick's house and began driving to Nashville in appellant's vehicle. Police officers stopped them in Murfreesboro. Ms. Myrick recalled seeing the police pull a small television out of the vehicle, but she did not know how the television came to be in the vehicle. On cross-examination, Ms. Myrick testified that she did not see appellant actually take anything and that she did not hear him instruct Ms. Houston to take the television, cellular telephone, or money. She heard appellant tell Ms. Houston to look for the marijuana that he assumed the victim had in his residence.

Dr. Kent Clark, a physician at Heritage Medical Center, testified that he treated the victim for various injuries in May 2012. Dr. Clark said that the victim had multiple rib fractures, two of which were "displaced fractures," meaning that "pieces had splintered and were displaced." He opined that a bone fragment punctured the victim's left lung, which caused it to partially collapse. Related to the collapsing of the victim's lung, Dr. Clark diagnosed the victim with traumatic pneumothorax, a condition in which air escaping from the lung is trapped in the chest and causes the lung to collapse. Dr. Clark explained that as the trapped air increases, it will move other structures in the chest, including the heart and the other lung. He said, "[A]t that stage, it becomes an immediate life-threatening situation." Dr. Clark described the pain associated with pneumothorax as "severe pleurisy-like pain." In addition, a person experiencing pneumothorax would have difficulty breathing. Dr. Clark testified that the victim's "degree of collapse was considered significant enough" to necessitate a chest tube, the placement of which was a surgical procedure requiring local anesthesia. The victim's chest tube was inserted while he was in the emergency room. Dr. Clark said that the victim developed pneumonia as a complication of his chest trauma. The victim was also diagnosed with traumatic subcutaneous emphysema caused by the trapped air in the victim's chest leaking into the soft tissue of his neck.

Regarding the victim's rib fractures, Dr. Clark testified that such injuries are treated with "adequate analgesics" and given time to heal. He said that rib fractures take six weeks to heal, and in this case, the victim was given "a potent narcotic" for the pain associated with the rib fractures. Dr. Clark stated that the pain continues during the recovery process but is at its worst during the first seven to ten days. Dr. Clark also testified that the victim had a "pretty significant scalp laceration" that was repaired in the emergency room. Dr. Clark recalled that the victim reported that "three gentlemen [had come] into his home, beat him with a baseball bat, and then left him tied to a chair." However, during redirect examination,

Dr. Clark stated that his written record of the victim's history actually said that the victim "was then bound and robbed" with no mention of a chair. Dr. Clark opined that the victim's injuries were consistent with being struck by a baseball bat. He said that not much force was required to create the victim's scalp laceration but "very significant force" was required to cause the rib fractures. Dr. Clark said that the victim was discharged from the hospital on May 12, 2012, but that he still had a fever and persistent pneumonia when he left.

Kenneth Antwan Dyer testified that he had been at the victim's house on an unspecified date in May 2012. He also went to appellant's house later that same day. While at appellant's house, he heard appellant say that "[h]e was going to beat [the victim] up." He went with appellant to the victim's house, but he did not go inside. Mr. Dyer said that he saw appellant put a baseball bat down his pants leg. Mr. Dyer stated that seeing appellant with the baseball bat made him realize that he needed to leave, so he began walking home. Two women, Ms. McCord and Ms. Jones, picked him up and drove him to his house. One of the women asked him to retrieve a pistol from her car. He did so, and then he threw the pistol behind an empty trailer. Later, when they decided to go to appellant's house, he retrieved the pistol again, and he gave it back to appellant.

Shelbyville Police Detective Sergeant Brian Crews testified that he coordinated the investigation in this case. He went to Murfreesboro when appellant's vehicle was stopped there. Detective Crews found a small flat-screen television inside appellant's vehicle. When Detective Crews showed the television to the victim, the victim identified it as the one taken from his house. Detective Crews interviewed appellant after informing him of his *Miranda* rights. Appellant told Detective Crews that "no one else was involved in this" and that he took full responsibility. Appellant denied using a baseball bat or a firearm and "denied personally taking the television." When asked why the incident happened, appellant said that "[w]ord on the street was that [the victim] had robbed [appellant]," that there was animosity between appellant and the victim, and that "[i]t had to happen." Detective Crews also interviewed the other people who had been at the victim's house, and their stories were not consistent with appellant's. Detective Crews testified that law enforcement never located the bat nor the handgun used in the incident.

On cross-examination, Detective Crews stated that he included the television and marijuana in the arrest warrant for especially aggravated burglary because Ms. Houston had confessed to taking marijuana she found in the victim's home. He further stated that the victim reported that a television, a cellular telephone, and money had been stolen.

Following Detective Crews's testimony, the State rested its case. Appellant did not present any proof. The jury found appellant guilty of especially aggravated burglary, the lesser included offense of facilitation of especially aggravated robbery, and especially

aggravated kidnapping. Subsequently, the trial court reduced the especially aggravated burglary conviction to aggravated burglary based on Tennessee Code Annotated section 39-14-404(d).

At appellant's sentencing hearing, the State introduced the presentence report and two arrest warrants. The State submitted that the arrest warrants were for pending cases and showed that appellant was on bond in those cases when he committed the instant offenses. The trial court found that the use of a deadly weapon enhancement factor applied to the especially aggravated kidnapping conviction but not to the other two convictions. *See* Tenn. Code Ann. § 40-35-114(9). The trial court also found that Tennessee Code Annotated section 40-35-114(13)(I) applied because appellant committed an offense while incarcerated for the instant offense.[2] The trial court found that he had a history of criminal activity in addition to that necessary to establish his range and that appellant was a leader in the offense. *Id.* § 40-35-114(1), (2). The trial court sentenced appellant to twenty-three years for especially aggravated kidnapping, ten years for facilitation of especially aggravated robbery, and five years for aggravated burglary, with all sentences to be served concurrently.

## II. Analysis

### A. Sufficiency of the Evidence

Appellant challenges the sufficiency of the evidence supporting his especially aggravated kidnapping conviction. He does not contest the sufficiency of the evidence for his other convictions. Specifically, he contends that the evidence did not support an independent conviction for kidnapping under *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012). While not stated as such, his argument implies that the confinement of the victim was incidental to the other offenses for which appellant was convicted, aggravated burglary and facilitation of especially aggravated robbery. The State responds that the evidence was sufficient.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354

---

[2] We note that the trial court misapplied enhancement factor (13)(I) by basing it on an offense committed *after* the instant offense. However, misapplication of an enhancement factor does not remove the presumption of reasonableness from the sentencing determination. *Bise*, 380 S.W.3d at 709. Moreover, appellant has not presented this issue on appeal, and it is therefore waived. Tenn. R. App. P. 36(a).

S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

In *White*, the court addressed the application of the due process test to convictions for kidnapping and an accompanying felony. The court held:

> the legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery. This inquiry, however, is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard.

362 S.W.3d at 562. The court concluded that our kidnapping offenses "evince a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *Id.* at 577. The supreme court in *White* held that "trial courts must ensure that juries return kidnapping convictions only in those instances in which

the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at 578. Our supreme court's ruling in *White* emphasized that it "does not articulate a new rule of constitutional law or retroactive application." *Id.* However, based on the facts of that case, the supreme court concluded that the "proof could be interpreted in different ways and, therefore, the determination of whether the removal or confinement of [the victim] constituted a substantial interference with her liberty was a question of fact for the jury." *Id.* at 579. According to the supreme court, a jury instruction requiring a "determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction" is needed to ensure constitutional due process is given to defendants charged with kidnapping and an accompanying felony. *Id.* at 578.

In *White*, the supreme court reviewed the jury charge in the trial and stated that, while the instructions tracked statutory language, "they did not define the key element — the substantial interference with the victim's liberty — as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *Id.* at 580. The court held that "[b]ecause the jury was not properly instructed on the question of whether the victim's removal or confinement was essentially incidental to an accompanying felony, the Defendant is entitled to a new trial on the especially aggravated kidnapping charge." *Id.*

In order to provide guidance to trial courts, the supreme court set out the following instruction to be followed by the courts:

To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of this case, including, but not limited to, the following factors:

- the nature and duration of the victim's removal or confinement by the defendant;

- whether the removal or confinement occurred during the commission of the separate offense;

- whether the interference with the victim's liberty was inherent in the nature of the separate offense;

- whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

- whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

- whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*White*, 362 S.W.3d at 580-81.

In this case, appellant does not dispute that the jury was properly instructed according to the pattern jury instruction adopted after *White*. Nevertheless, appellant contends that the jury erred by finding sufficient proof to satisfy a conviction for especially aggravated kidnapping independent of appellant's other convictions for aggravated burglary and facilitation of especially aggravated robbery. We disagree.

Viewed in the light most favorable to the State, the proof at trial showed that appellant entered the victim's house with the intent to beat him, as shown by his statements prior to arriving at the victim's house and his carrying a baseball bat concealed in his pants into the victim's house. He struck the victim with the baseball bat three times, breaking five ribs and causing a large laceration on the victim's head. While no issue regarding serious bodily injury has been presented on appeal, we note that based on Dr. Clark's testimony and the victim's testimony, this element was clearly met. The victim testified that while he was on the ground after being struck, he saw Ms. Houston, appellant's sister, carrying the television from his bedroom. Then, he was hogtied by appellant, possibly with Ms. Houston's assistance. The victim and Ms. Myrick both testified about how appellant tied the victim. After he was tied, appellant and Mr. Twilley carried the victim to the bathroom, literally throwing him inside. The victim freed himself after approximately thirty minutes and sought help at that point. In the meantime, a bone fragment from his rib punctured his lung, causing the lung to collapse and air to begin filling his chest cavity — a life-threatening condition known as pneumothorax.

Appellant argues in his brief that contradictions in the trial testimony regarding the nature of appellant's confinement rendered the evidence insufficient to support his conviction. However, all factual disputes raised by the evidence are resolved by the jury as

trier of fact, and the jury resolved the disputes against appellant. *Bland*, 958 S.W.2d at 659. In our view, the evidence supports appellant's conviction for especially aggravated kidnapping. The victim's confinement prevented him from summoning assistance immediately, reduced appellant's risk of detection by allowing him enough time to flee the county, and increased the victim's risk of harm considering the nature of his injuries. The jury determined that the victim's confinement was not incidental to the aggravated burglary and facilitation of especially aggravated robbery, a determination well within the jury's province. *See White*, 362 S.W.3d at 579. Therefore, appellant is without relief as to this issue.

## B. Sentencing

On appeal, appellant challenges the sentence for his especially aggravated kidnapping conviction. He argues that the trial court imposed an excessive sentence by applying an enhancement factor that was an element of especially aggravated kidnapping and by failing to following the sentencing guidelines, as shown by the inequality in sentencing between appellant and his co-defendants. The State responds that the trial court properly sentenced appellant.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id*. § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair

and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In this case, appellant was subject to a sentence of fifteen to twenty-five years for his especially aggravated kidnapping conviction, and the trial court, after applying four enhancement factors, sentenced him to serve twenty-three years. *See* Tenn. Code Ann. § 40-35-112(a)(1). Appellant contends that the trial court erred by applying one of the enhancement factors — use of a deadly weapon, Tennessee Code Annotated section 40-35-114(9) — when a deadly weapon was used to inflict the serious bodily injury upon which the especially aggravated kidnapping was based. However, the indictment charging especially aggravated kidnapping alleged that appellant committed especially aggravated kidnapping by causing the victim to suffer "serious bodily injury," not through use of a deadly weapon. Tenn. Code Ann. § 39-13-305(a)(1), (a)(4). Therefore, use of a deadly weapon was not an element of the charged offense, and the trial court did not err by applying enhancement factor (9) to the charge of especially aggravated kidnapping.

Regarding appellant's contention that the trial court did not comply with the sentencing guidelines based upon the inequality between appellant's effective sentence and his co-defendants' sentences, appellant has not provided any support for his allegation. Even if he had shown that his co-defendants were not sentenced to more than ten years, as he

argues in his brief, appellant's especially aggravated kidnapping conviction carried a minimum sentence exposure of fifteen years. Moreover, the trial court properly found that appellant was a leader in the commission of the offense. As such, additional enhancement of his sentence was appropriate. We conclude that appellant has failed to show that the trial court abused its discretion in its sentencing.

## CONCLUSION

Based on the record, the applicable law, and the briefs of the parties, we affirm the judgments of the trial court.

_____

ROGER A. PAGE, JUDGE